Danforth, J.
 

 —The plaintiff’s object,
 
 first,
 
 that certain acts of the defendant, the Ogdensburg and Lake Champlain Railroad Company, done and threatened, are in excess of its powers and illegal.
 
 Second,
 
 that if otherwise valid the defendant has so bound itself by contract that the appropriation of its earnings to carry out those acts is a breach of that contract. So far they have succeeded. Interlocutory judgment was given in their favor at special term, and affirmed at general term. The questions submitted to the court were raised by demurrer to the complaint, and this appeal involves an inquiry as to whether the allegations of that pleading are sufficient to constitute a cause of action.
 

 The defendant, appellant here, is a railroad corporation, organized and incorporated under and in pursuance of the
 
 *337
 
 laws of the state of New York. As such it owned and operated a line of railroad from Ogdensburg to Rouse’s Point in this state, and in the year 1880 was authorized by a special act of the legislature (Laws of 1880, chap. 73) to issue bonds in such form, and payable at such time as its directors might determine, and secure the whole or any part of said bonds by a mortgage upon its franchise, railroad and other property, both real and personal. Prior to this time, in October, 1872, the legislature of the state of Vermont created a railroad corporation under the name of • “The Lamoille Valley Extension Railroad Company,” to build a railroad from some point in the towns of Swanton and Alburgh to the north line of this state, in the town of Alburgh, with the right to build and maintain a bridge with a suitable and convenient draw for the passage of vessels, from some convenient point at or near the eastern shore of the Missisquoi Bay, in the town of Swanton to some point at or near the western shore of Missisquoi bay in the town of Alburgh, a distance of about twelve miles. The act also provides that its directors may, at anytime, make such alterations in the route or location of said road as they may deem necessary or expedient, and also that the corporation “may contract with the managers of any railroad company to perform all transportation of persons and property upon and over said road, and may lease their said road and do such other things as may be necessary to build and run said road.” But declares that “if said corporation shall not, within ten years from the approval of this act, commence the construction of said railroad, then said corporation shall be dissolved.
 

 Ten years and more elapsed after the charter was approved and the construction of the road had not been commenced, but on the 2d of February, 1882, the Lamoille Valley Fxtension Company entered into an agreement with Vanderbilt and Phelps and the defendant, the Ogdensburg and Lake Champlain Railroad Company, by which after reciting that with a view to establish all rail routes ■ for traffic and passengers between the west and northern New England, and to form necessary connections to carry the same into effect, a new railroad must be constructed from Rouse’s Point to Maquam Bay or Swanton, in the state of Vermont and the railroad companies above-named deem it for their interests to have such railroad constructed, and such connections made; the Lamoille Valley Exten- ' sion Company agreed to issue so many first mortgage bonds, not exceeding $3,500,000, as should be sufficient to construct the road and bridges. Vanderbilt and Phelps agreed to purchase them for that purpose and the Ogdensburg and
 
 *338
 
 Lake Champlain Railroad Company agreed that when the road should be completed they would take a lease of it in perpetuity in the form and on the conditions then agreed upon. Subsequently the road was built and on the 31st of December, 18h3, an agreement was made between the Lamoille Valley Extension Company, of the first part, and the Ogdensburg and Lake Champlain Railroad Company, of the second part, by which the former leased to the other its railroad, “together with all the lands on which said railraid is constructed, including all the lands acquired, held and owned by the parties of the first part for roadway, station, and all other purposes of their incorporation, and all the rights, easements, franchises and privileges, in connection therewith or which are appurtenant thereto and all the superstructure of said railroad of whatever name or nature, and all the buildings, bridges, wharves, docks and piers and structures of whatever name or nature pertaining to said railroad, and the land and the premises on which the same are standing and all the rights, privileges and franchises of the said parties of the first part, now possessed by them, including their right to construct, maintain and operate said roadroad and all the rights, privileges and franchises, which the said parties, of the first part, may hereafter lawfully have, obtain and exercise, to hay 2 and to hold the same from the date thereof in perpetuity.”
 

 The defendant, the Ogdensburg and Lake Champlain R. R. Co., on it part agreed to equip, maintain and operate the demised railroad as a part of their line, and to keep it, “its bridges,” etc., m good order, to pay taxes assessed upon it and certain other expenses, to pay also the interest and principal at maturity of the bonds issued to Vanderbilt and Phelps under the agreement of February 2, 1883, and further that the whole of the annual gross earnings of the demised railroad shall be annually applied and used, first, to the payment of the interest upon said bonds as the same becomes payable, and, second, to the creation and payment into a sinking fund for the gradual redemption of and payment of the principal of said bonds, of which sinking fund the Ogdensburg and Lake Champlain R. R. Co, were made the trustees and an amount of said bonds equal to one-fiftieth part of the whole amount thereof shall annually be canceled, it being understood, however, that whether said gross earnings are adequate to these purposes or not, the parties of the second part are to pay semi-annually the interest of said bonds as the same becomes due, and annually obtain and cancel one-fiftieth part of the whole amount of said bonds.
 

 The learned counsel for the respondents contends that by
 
 *339
 
 reason of the omission of the Lamoille Valley Extension Company to commence the construction of its road within the time prescribed by the charter, its existence ended and left it without power to do a corporate act. The language of the act is that in such event “said corporation shall be dissolved.’5 In this state it is well settled that under a similar statute dissolution is not effected by a mere failure to perform the condition nor without judicial proceeding and judgment. The cases cited for the appellant
 
 (Matter of B. W. and N R R Co
 
 , 72 N. Y., 245, 75 id, 335;
 
 Brooklyn S. T. Co
 
 v Brooklyn, 78 id , 525), are easily distinguishable from the case at bar. The statute before the court'in those cases provided in express terms that if the railroad company in question failed to furnish its road within a time specified, “its corporate existence and power shall cease.’5 It was held that the statute executed itself, and that non-compliance with the condition extinguished the corporation in question by virtue of an express limitation upon the original grant of corporate power. But the general principle was recognized that in the absence of such or like language a corporation, by omitting to perform a duty imposed by its charter, or to comply with its provisions, does not
 
 ipso facto
 
 lose its corporate character. It does not appear that any different effect is given to such a statute by the courts of Vermont, but, on the contrary, in
 
 Vermont and Canada R. R. Co.
 
 v.
 
 Vermont and Central R. R. Co.
 
 (34 Vermont, 2), the supreme court of that state say it is beyond question that unless the legislature undertake to declare a forfeiture upon facts that have already occurred it appertains to the judicial department of the government to determine whether such forfeiture has been incurred So far, therefore, the courts agree.
 

 It is next argued for the respondent that the arrangement expressed through these instruments, so far as The Ogdensburg and Lake Champlain Railroad Company is concerned, is beyond the capacity and power of that corporation. We have seen that the Vermont railroad company had corporate powers, and among those expressly given by its charter is a power to lease its road. It had, therefore, contracting capacity and was a good party to deal with. The Ogdensburg and Lake Champlain Railroad on its part lacked no power expressly given by statute to similar corporations in this state, nor any which as incident and necessary thereto might enable it to carry on the objects of its incorporation. Among other statutes to which it might appeal, was one “authorizingrailroad companies to contract with each other.” Laws 1839, chap. 218. Under this act it might lawfully agree “ with any other railroad corporation ” for the use of its road in any manner
 
 *340
 
 not inconsistent with the provisions of the charter of the corporation whose railroad is to be used under such contract. The contract in question is not affected by the limitation expressed in the act, and unless we are to imply into it another restriction and say that its operation must be confined to contracts with roads operating in and under the laws of this state, the lease must be held valid between the parties. We see no reason for such restriction, nor any principle of public law which requires it. We are not at liberty to create it. It would be legislation not construction. A corporation given capacity to contract may exercise that capacity with any party in or outside the limits of the state, unless the law making power of that other state forbids.
 
 Bank of Augusta
 
 v.
 
 Earle,
 
 13 Peters, 519.
 

 Our own statutes and the interpretation given to them by the courts are to that effect.
 
 Woodruff
 
 v.
 
 Erie R. R. Co.,
 
 93 N.Y., 609;
 
 In re N. Y., L. E. and W. R. R. Co.,
 
 99 id., 12;
 
 In re Peter Townsend,
 
 39 id., 171;
 
 In re Staten Island Rap. Tr. Co.,
 
 103 id., 251; 3 N. Y. St. R., 48.
 

 In this case there is no such prohibition. Nor do we find that the defendant has hired, or that the lease covers an incomplete road. It was indeed finished in performance of an agreement entered into at the same time the lease was bargained for, but the parties intended only a completed road, and before the lease was executed the road was completed. It was thought to be a wise exercise of the power conferred upon its directors in the management of its affairs. Its object, to secure a continuous load, with connections necessary to extend its business and so accommodate freighters and passengers, and at the same time add to its receipts, is opposed to no principle of public policy. There is no suggestion that it was fraudulently made, nor but that the terms are reasonable, agreed upon in good faith and in the honest belief that the interests of the corporation would by it be promoted.
 

 We think the agreement was not beyond the power of the corporation to make; that the lessor was able and not restrained to make the lease; that the lessee was capable and not disabled to receive the thing demised, and, thérefore, as between the parties, that the lease was valid. The payment of interest upon the bonds issued by the Lamoille company, and the annual payment of a portion of the principal of those bonds, was_, by way of rent, merely for the use of the road and the privileges procured thiough the lease. If the lease was valid, whether the lessee paid the rent in money or its own bonds or promises, or by discharging an obligation of the lessor, could make no difference. In either way it obtained credit in connection with its business. There was a choice of means to effect a lawful pur
 
 *341
 
 pose, and it was within the discretion of the contracting parties to adopt one rather than the other as a part of the transaction.
 

 We are next to consider the relation of the parties and their rights as defined by contract. So far as presented in this action, they depend upon the true construction of the terms of the income bonds above referred to, and part of which are held and owned by the plaintiffs. Their claim is that the defendant had no other source, “ or property, than its own earnings,” to meet the obligations incurred to the Lamoille company; that these earnings are insufficient to meet the accruing interest upon the income bonds, and if diverted to the discharge of the new indebtedness, will be absorbed thereby, and so they allege that in carrying out the terms of the lease and paying the rent reserved, the defendant is diverting money or revenue to which they are entitled under the bonds. The plaintiff’s case is put and must stand, if at all, upon the terms of the bond and upon nothing else. What those are will now appear. The complaint shows that in pursuance of the act of 1880
 
 (supra),
 
 the company executed its mortgage to trustees, reciting therein its determination to issue two classes of bonds, one to be known as “the first consolidated mortgage bonds,” not to exceed in amount $3,500,000, and the other as “income mortgage bonds,” not to exceed in amount $1,000,000, all payable in forty years from the 1st of April, 1880, with interest on the first class half yearly, and on the second or income bonds, annually, payment of both principal and interest of the first class, but only the principal of the second class, to be secured by mortgage.
 

 The promise to pay interest upon the latter class is subject to the condition that “the net earnings of the railroad and other property of the company for each period, after satisfying the expenses of operating and maintaining the same with all taxes, assessments and floating indebtedness and the interest on all liens, charges, incumbrances and other indebtedness (but not meaning thereby any dividends on the preferred stock of said company) on the property of or owned by said company shall respectively suffice to pay such rate of interest on all this issue of bonds then outstanding at the specified dates following each of said periods or such interest less than six per centum per annum as such net earnings during such periods shall be sufficient to pay upon all said bonds then outstanding, each of the same being entitled to a ratable share thereof, and provided that the interest warrant or coupon of that date, and also all such warrants or coupons which shall have previously matured be presented and surrendered as aforesaid.”
 

 The bond also declares that it is “covenanted and
 
 *342
 
 agreed by and between the said company and the present and future holders of the bond and the interest warrants or coupons thereto annexed that the words “net earnings” in this bond, and in each of said warrants or coupons signify the amount remaining of the income of said company from its railroad and other property during each such period after satisfying and discharging all the expenses, interest and other charges aforesaid, and that the board of directors of said company shall determine the amount of such net earnings in each of such periods aforesaid.”
 

 The coupon contains the same condition expressed in fewer words, and is a promise on the part of the company to pay the sum named, “or so much thereof as its net earnings for the year then ending according to the terms of the bond will pay.” The property mortgaged includes the railroad of the company and all its branches, “together with the franchise of the company of operating and carrying on the same, and all income and profits, and all privileges, rights and real estate now owned by said company, or which may be hereafter owned or acquired by it,” with an exception not material here, together with all its rolling stock “and other property now owned or hereafter to be owned or acquired by said company, and in any way belonging or appertaining to the said railroad of said company.”
 

 By the terms of the mortgage it is subject to the right of the railroad company, it successors or assigns, to retain the free and uncontrolled use, enjoyment, possession and management of the premises, rights and property granted or intended so to be, so long as it shall pay the principal and interest of said first consolidated mortgage bonds and the principal of said income mortgage bonds according to their terms, and shall keep its covenants and agreements in this deed or mortgage contained. So also the condition which, when performed, is to annul and make void the mortgage, is in terms the payment of the first class of bonds, both principal and interest, and the principal only of the second class or income mortgage bonds.
 

 These things are restrained by an express covenant and agreement between the parties to the mortgage, “for themselves and their successors and assigns,” and for all parties who shall become interested as holders or owners of the bonds in manner following, that is to say:.
 

 First.
 
 That this mortgage is given to secure primarily the payment of the principal and interest of said first consolidated mortgage bonds of said party of the first part, and, secondarily, after the payment in full of said first consolidated mortgage bonds and the then accrued interest thereon, the payment of the principal (but not the interest thereon) of said income mortgage bonds.
 

 
 *343
 

 Second.
 
 That the company will pay at maturity the principal and as it accrues, the interest of the first consolidated mortgage bonds and the principal of the income bonds.
 

 In other respects, the same care is exercised in distinguishing between the two classes of bonds and the rights of the holders of interest coupons attached thereto, and when at last provision is made for the distribution of proceeds arising from a forced sale under the mortgage, it is directed to be paid, first, upon expenses, etc.; second, upon the interest due on the first class of bonds, then upon the principal of those bonds; and, lastly, if any part remains, upon the principal of the income bonds, making no mention of the interest on those bonds, and so marked in this line of exclusion that, contemplating the possibility that something might be left after meeting claims thus enumerated, it provides that if any surplus remains it shall be paid over, not to the holder of interest coupons of the income bonds, but to the mortgagor.
 

 The mortgage also provides that whenever, and as often as the company, its successors or assigns, shall acquire any franchises, lands, equipment or other property, or interest of any name or nature for the use of or in connection with its railroad, or for the purpose of its incorporation, it shall be held subject to the lien and trusts of the mortgage, and further mortgage and assurance shall be given upon it if requested. There are no other provisions bearing upon the proposition before us, and upon those the plaintiff’s position is that the income of the defendant, as that phrase is defined in the mortgage, from which we have quoted, is charged with the payment of the plaintiff’s bonds and is not applicable to any contract subsequently entered into until that charge is extinguished. The defendant’s contention is that, notwithstanding the terms of the bond and mortgage, its income may be applied to the' extension of its road, or to the promotion of any undertaking within the line of its corporate powers, and which, in the judgment of its directors acting in good faith, will be for the advantage of the company and promote its interests, although such application should so diminish, or even altogether absorb, the fund that no part would remain for payment upon the interest of the income bonds.
 

 The statute declares that every corporation organized as the defendant was under the act of 1850 (chap. 140, § 5), shall have a board of directors to manage its affairs, and it must follow that so long as no provision of law is violated, they are subject to no other supervision than that of the legislature. The plaintiffs so far as any claim is now involved, are simply contract creditors having a debt against the corporation, but no lien by mortgage and with no other
 
 *344
 
 right than to have it paid out of the proper fund, viz.: its “net earnings,” the amount of which is to be determined by its board of directors at the expiration of each interest period, and such -is the effect and the language of the agreement between the parties that if at one tine there, should be found a deficiency of income and at another a surplus of income, the surplus cannot be applied to make up the deficiency then existing nor reserved to apply upon a subsequent deficiency. Each interest period stands by itself and the earnings of one period cannot be applied upon any interest coupon except the one for that period. They are not cumulative, and the inquiry at any given period must be whether earnings have accrued during the particular year for which they are demanded and as the amount is to be determined at specified times and by the directors, so the parties, as we have seen, agreed upon the elements from which such determination should be made. It is not the whole income but so much as remains of the income of the company after satisfying the expenses of operating and maintaining the road, with all taxes, assessments and floating indebtedness and the interest on all liens, charges, incumbrances and other indebtedness—on the property of or owned by said company. This is, at most, an agreement to pay dividends if dividends are earned.
 

 The contention of the learned counsel for the respondent and the effect of the judgment below is that the power of the company to change the condition of the road, although by additions or extensions and improvements consistent with the purposes of its incorporation, is limited and restrained by those provisions. It does not seem probable that such was the intention of the parties. The bonds are to run forty years. The earnings are to be determined at the end of each year. Did the parties suppose that in the meantime the road was to be stationary that the developments which time and the competiton of new roads or a. demand for greater facilities would require should be applied only to the road as it existed at the time of the mortgage? When they speak of the expenses of operating and maintaining the road do they mean the road as it was in 1880? Was it supposed that no changes were to be provided for within the forty, years? If so, for what purpose was the agreement made and put into the mortgage, that if, and whenever, and as often as the company «should in any manner acquire any franchises of any nature or description, lands or other property for the use of its railroad, or in connection with its railroad they should be held subject to the lien and trusts of the mortgage or other conveyance made if necessary to convey them to the trustees.
 

 Such is the agreement and from that it is plain the
 
 *345
 
 parties had in view the prospective wants of the railroad. They must be deemed to have understood that those warns would be supplied in the usual manner; if upon credit, that an indebtedness would be created, and if for cash, that both the indebtedness contracted and the cash paid must come either from the earnings of the company or a sale of its property. In either event it would reduce the income provided for, but at the same time add a new source of income of which the bondholder would have the benefit. In short, a fair and just construction of the agreement as expressed in the bond requires us to hold that the parties contemplated a line of active and efficient railroad and not a line or road in suspense or liquidation. In other words, they provided for a road to be managed in the usual manner, according to the discretion and judgment of its directors. Changes so occasioned might at one time diminish and at another increase the net earnings of the road The operating expenses would be constantly liable to change. Uniformity is not bargained for nor promised. If that was intended it is difficult to see why the bond or mortgage did not provide that the operations of the company during the forty years of credit should be confined to the running of its road, between the then termini, instead of providing for the acquisition of new franchises and the subjection of them to the lien of the mortgage. Nothing is said against making the road more useful by improvements or by new tracks, terminal facilities, elevators, leased roads or otherwise, although at an increased expenditure. The implication from the terms used is quite the other way. Nor do I find anything in the provisions regulating the rights of the parties which sustains in any manner the contention denying the power of the directors to use the earnings of the corporation for such improvements or other lawful purposes in its business as they may think best. I have already given at length the phrases of the bond and mortgage on which reliance is placed, and it is obvious that there are none which in terms declare such prohibition nor do I think that the construction contended for is warranted by the words actually used, and that in according to it that construction the court below has inserted by implication that which the parties have not expressed, and which in view of the precise language employed they seem to have intentionally avoided.
 

 It is not alleged that any portion of the earnings actually remain in the hands of the company beyond a sum sufficient to discharge obligations due from it, but that there would have been, and will yet be a sum of money to be applied upon the income bonds, provided the payments already
 
 *346
 
 made upon the lease are canceled and no others provided tor. _ That is not to the point. As the lease is valid and within the powers of the company and the company entitled to receive all the earnings they must be applied in the discretion of the directors and the payments already made must stand.
 

 If these views are correct, it is unnecessary to consider other questions raised by the appellant and which are not without force, for it follows that there has been no misapplication of the funds or earnings of the road, that there has been no diversion of them from any purpose for which they were intended, nor any violation of the contract under which the plaintiffs claim.
 

 The complainant therefore fails to state a cause of action, and the defendant could not properly be required to answer. It follows that the demurrer was well taken.
 

 The judgment appealed from should be reversed in both courts, the order of the special term overruling the demurrer should be reversed and the defendant have judgment dismissing the complaint with costs.
 

 All concur.